# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>PHILIP D. MURPHY, in his official capacity as Governor of New Jersey, *et al.*,<br><br>*Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | HON. SUSAN D. WIGENTON, U.S.D.J.<br><br>HON. LEDA D. WETTRE, U.S.M.J.<br><br><br>CIVIL ACTION NO. 20-cv-3269<br><br>**CIVIL ACTION**<br><br>**(ELECTRONICALLY FILED)** |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Pro hac vice* application forthcoming

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 4

I.    Executive Order 107 Effectively Bans the Sale of Firearms in
New Jersey. ................................................................................................ 4

II.   EO 107 Prevents Plaintiffs From Purchasing and Selling Firearms. .............. 7

ARGUMENT ...................................................................................................... 9

III.  Plaintiffs Are Likely To Succeed on the Merits of their Second
Amendment Claim. ................................................................................... 10

     A.    The Ban on Firearm Purchases Burdens Conduct Protected by the
Second Amendment. ....................................................................... 11

     B.    Because it Constitutes a Flat Ban on the Exercise of Second
Amendment Rights, EO 107 Is Categorically Unconstitutional. ........ 17

     C.    Defendants' Ban on Firearm Purchases Fails Any Level of
Heightened Constitutional Scrutiny. ................................................ 22

          1.    At a Minimum, Strict Scrutiny Should Apply. ......................... 22

          2.    The Ban on Firearm Purchases Fails Even Intermediate
Scrutiny. ................................................................................. 23

IV.  Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary
Injunction. ................................................................................................ 35

V.   The Balance of the Equities Favors the Grant of Preliminary Injunctive
Relief. ....................................................................................................... 36

VI.  The Court Should Waive the Bond Requirement or Set Bond at a
Nominal Amount. ..................................................................................... 37

VII.   The Court Should Enter Final Judgment Awarding a Permanent
       Injunction. ......................................................................................38

CONCLUSION ....................................................................................39

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................... 13

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011) ................................................................... 25, 26

*Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen.*
    *New Jersey*, 910 F.3d 106 (3d Cir. 2018) ........................................... 13

*Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097 (9th Cir. 1998) ................. 38

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) ......................... 22, 23, 33

*Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*,
    2 F. Supp. 2d 637 (D.N.J. 1998) ...................................................... 37

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ......................................... 32

*Buck Foston's New Brunswick LLC v. Cahill*,
    2013 WL 5435289 (D.N.J. Sept. 27, 2013) ......................................... 26

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ....................... 25

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) .............................. 25

*Civil Rights Defense Firm, P.C. v. Wolf*, No. 63 MM 2020
    (Pa. Mar. 22, 2020) ............................................................ 18, 28, 34

*Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602 (D.N.J. 1990) ..... 21

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ............................ 36

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994) ......................................... 38

*DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149 (3d Cir. 1984) ................ 38

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................... 1, 3, 10, 11, 13, 14, 16, 18, 19, 21, 23

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) .................................. 12

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996) .................................................. 37

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................... 11, 12, 36

*Getzes v. Mackereth*, 2013 WL 5882040 (M.D. Pa. Oct. 30, 2013) ....................... 38

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ........... 25, 26, 27

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) .............................. 26

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..............................11

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
   961 F. Supp. 2d 928 (N.D. Ill. 2014).....................................................12, 23

*Jackson v. City & Cty. of S.F.*, 746 F.3d 953 (9th Cir. 2014).................................12

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99
   (3d Cir. 2013).....................................................................................35, 36

*Kickapoo Traditional Tribe of Texas v. Chacon*,
   46 F. Supp. 2d 644 (W.D. Tex. 1999) ..................................................39

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) ....................................................36

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018).........................................................................26

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ..............................................31, 32

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ........................................1

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................10, 14, 20, 22, 36

*Miller v. Skumanick*, 605 F. Supp. 2d 634 (M.D. Pa. 2009)....................................10

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...........................................21, 39

*Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014).........................38

*Radich v. Guerrero*, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016).................12

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018).....................................20

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .................................9, 10

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...........................22

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ...............................................13

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991).............................................37

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).........................11, 12, 21

*Valley Forge Christian Coll. v. Americans United for Separation of Church &
   State, Inc.*, 454 U.S. 464 (1982) ........................................................29

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .................21, 36, 39

*Youngstown Sheet & Tube Co. v. Sawyer* (*Steel Seizure*), 343 U.S. 579 (1952).......1

## **Constitutions, Statutes and Rules**

U.S. CONST. amend. II................................................................................10

15 U.S.C. § 5001(g)(ii) .................................................................21

18 U.S.C.

    § 922(a)(1)(A) ...................................................................5

    § 922(c) .........................................................................5, 18

    § 922(t) .........................................................................6, 18

21 U.S.C. § 812 ..............................................................................28

FED. R. CIV. P. 65(a)(2) ............................................................37, 38

N.J.S.A.

    § 2C:39-1(f) .....................................................................21

    § 2C:58-2(a)(1) ............................................................5, 18

    § 2C:58-3 ..........................................................................21

    § 2C:58-3(a) .......................................................................5

    § 2C:58-3(a)(1) ..................................................................5

    § 2C:58-3(a)(2) ............................................................5, 18

    § 2C:58-3(a)(3) ..................................................................6

    § 2C:58-3(b) .......................................................................5

    § 2C:58-3(b)(1) ..................................................................5

    § 2C:58-3(b)(2) ............................................................5, 18

    § 2C:58-3(b)(3) ..................................................................6

N.J.A.C.

    § 13:54-3.2 .........................................................................6

    § 13:54-3.12 .......................................................................6

    § 13:54-3.13(6) ..................................................................6

## **Other Authorities**

Administrative Order No. 2020-5, Essential Retail Businesses
(Mar. 24, 2020) ...........................................................................4, 5

Anthony Bellano, *Some NJ Cops Positive For Coronavirus, Others
Quarantined*, PATCH, Mar. 21, 2020, https://bit.ly/2xl0ifd .........14, 15

Bureau of Alcohol, Tobacco, Firearms and Explosives, *List of New Jersey
Federal Firearms Licensees (FFLs)* (Dec. 2019)................................28

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Permanent Brady State Lists*, https://bit.ly/33SfX1N ...............................................................................33

Yesenia Amaro, *3 arrested on suspicion of looting Fresno County stores amid coronavirus outbreak*, THE FRESNO BEE, Mar. 23, 2020, https://bit.ly/3bmZoNX................................................................................15

Chris Cillizza, *How coronavirus has sent gun and ammo sales through the roof*, CNN, Mar. 25, 2020, https://cnn.it/2WID0dM ...................................16

Connecticut Department of Economic & Community Devel., Business Exemptions for Coronavirus – Executive Order 7H (Mar. 23, 2020)................30

Stefanie Dazio & Don Thompson, *LA sheriff clashes with county lawyer over closing gun shops*, FOX 26 NEWS, Mar. 24, 2020, https://bit.ly/3dwjMxZ ........34

Executive Order 107 (Mar. 21, 2020).......................................................................4

Executive Order No. 2020-10, Executive order in Response to COVID-19 (Illinois Mar. 20, 2020)...........................................................................30

Executive Order No. 2020-12, Prohibiting the Closure of Essential Services (Ariz. Mar. 23, 2020) ...........................................................................30

Executive Order No. 7H, Protection of Public Health and Safety During COVID-19 Pandemic and Response (Connecticut Mar. 20, 2020)....................30

David Hernandez, *Man, woman arrested on suspicion of looting in Chula Vista*, SAN DIEGO UNION-TRIBUNE, Mar. 22, 2020, https://bit.ly/3btPb2x...................15

Kurtis Lee & Anita Chabria, *As the coronavirus pandemic grows, gun sales are surging in many states*, L.A. Times, Mar. 16, 2020, https://lat.ms/39kNVNt ...16

Joe Malinconico, *Paterson police officer and fire captain test positive for coronavirus*, PATERSON PRESS, Mar. 24, 2020, https://njersy.co/2UBONb5.....15

Alexander Mallin & Luke Barr, *Police implement sweeping policy changes to prepare for coronavirus spread*, ABC NEWS, Mar. 18, 2020, https://abcn.ws/3bl7sij ..........................................................................14

Lucas Manfredi, *Jails release thousands of inmates to curb coronavirus spread*, FOX BUSINESS, Mar. 22, 2020, https://fxn.ws/2UtPRxG.......................15

MARATHON STRATEGIES, LIQUOR STORE DENSITY BY STATE (2014) .....................28

*National Instant Criminal Background Check System (NICS),* NJ STATE POLICE NICS ONLINE, https://www.njportal.com/NJSP/NicsVerification ......................6

New Jersey Office of the Governor, *TRANSCRIPT: March 25, 2020 Coronavirus Briefing*, https://bit.ly/2UlDcyf....................................................................3, 24

Office of the Governor of Louisiana, COVID-19 Statewide Stay at Home Order: Additional Illustrative Examples of Critical Infrastructure Businesses Consistent with Cyber and Infrastructure Security Agency Guidance (Mar. 22, 2020) ..................................................................30

Ohio Department of Health, Director's Stay at Home Order (Mar. 22, 2020) ..................................................................30

Richard A. Oppel, Jr., *For Some Buyers With Virus Fears, the Priority Isn't Toilet Paper. It's Guns.*, NY TIMES, Mar. 16, 2020, https://nyti.ms/39gfRCc ...........................................................16, 17

Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, NY TIMES, Mar. 23, 2020, https://nyti.ms/3akEZJd ............16

State of Wisconsin Department of Health and Human Servs., Emergency Order #12: Safer at Home Order (Mar. 24, 2020) ......................................................30

Governor Tom Wolf, Industry Operation Guidance (Mar. 24, 2020), https://bit.ly/3bnifZl ..............................................................34

**INTRODUCTION**

The United States Constitution was designed to endure through "the various crises of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). Those who wrote it "knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer* (*Steel Seizure*), 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And the rights and liberties they passed down to us, and safeguarded in the pages of the charter they wrote, have force not only in good times but also in bad—not only in times of peace and plenty, but also (perhaps especially) in times of crisis.

That is particularly true of the Second Amendment. The right to keep and bear arms safeguarded by that provision, the Supreme Court has explained, was "a *pre-existing* right"—"the natural right of resistance and self-preservation"—that predated the Amendment's adoption in 1791, and, indeed, predated *government itself*, according to the political theory of the Founding. *District of Columbia v. Heller*, 554 U.S. 570, 592, 665 (2008). And it is in times of social upheaval—times of crisis—that the fundamental right of an individual, law-abiding citizen to engage in armed defense of himself, his family, and his home is at its zenith. During the present moment of unprecedented social disruption—when police forces are strained to the breaking point, public acts of lawlessness are becoming increasingly common,

1

and thousands of prison inmates are being released back onto the streets—the importance of recognizing and protecting the fundamental right of law-abiding citizens to defend themselves and their families has never been higher.

The Second Amendment right protects, at a bare minimum, the right of a law-abiding individual to acquire *at least some* firearm and ammunition for use in the home for self-defense. But the Executive Order Defendants have adopted and enforced in response to the global COVID-19 pandemic, Executive Order 107 ("EO 107"), completely prohibits that conduct. Under that Order, all firearm retailers in the State must remain closed indefinitely—and by law, no law-abiding citizen may purchase any firearm anywhere in the State without making a trip to a brick-and-mortar firearm retailer. EO 107 thus, by its text and by its necessary effect, flatly and indefinitely prohibits the sale of any firearms anywhere in the State. It is difficult to imagine a restriction more completely antithetical to the Second Amendment's protections.

No one questions the severity of the threat posed by the global COVID-19 outbreak, or the need to take extraordinary measures to contain the virus. But the submission that a blanket order closing all firearm retailers is necessary to protect public health is belied by the text of EO 107 itself. While that Order contains no exemption for firearm retailers, it *does* contain myriad exceptions for other retail establishments—including liquor stores, cell-phone shops, garden centers, and

marijuana dispensaries. The potential risk to public health posed by these exempted establishments *dwarfs* that of firearm retailers—liquor stores alone outnumber firearm stores in New Jersey by a factor of 7 to 1. Like these far-more numerous and far-less critical establishments, firearm retailers could and would remain open on a limited basis, while taking every available measure to eliminate the spread of the coronavirus, without posing any significant threat to public health and safety.

It is utterly fanciful to acknowledge that the exempted retailers can safely keep their doors open but then, in the next breath, insist that all firearm stores must close in the name of public health. Defendants have not even tried to justify that disparate treatment. Instead, when asked just yesterday why firearm retailers have not been deemed "essential," Defendant Governor Murphy made his real motivation clear: "A safer society for my taste has fewer guns and not more guns."[1] While Governor Murphy is entitled to his policy views, the Second Amendment *does not* permit him to ban all firearm sales in the State based on nothing more than his *rejection* of the very policy choice that the Second Amendment enshrines in our highest law: that "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" must be "elevate[d] above all other interests." *Heller*, 554 U.S. at 635. This

---

[1] New Jersey Office of the Governor, *TRANSCRIPT: March 25, 2020 Coronavirus Briefing*, at 9, https://bit.ly/2UlDcyf (attached as Exhibit 1 to Decl. of Daniel L. Schmutter (Mar. 26, 2020)).

Court should restrain and enjoin EO 107's unnecessary infringement of Second Amendment rights.

## BACKGROUND

### I.    Executive Order 107 Effectively Bans the Sale of Firearms in New Jersey.

In response to the spread of the COVID-19 virus within the United States, Governor Murphy signed an Executive Order, on March 21, 2020, imposing a variety of extraordinary lockdown measures in New Jersey. *See* Executive Order 107 (Mar. 21, 2020) (attached as Exhibit 2 to Decl. of Daniel L. Schmutter (Mar. 26, 2020) ("Schmutter Decl.")). Executive Order 107 prohibited nonessential travel, required all citizens to practice "social distancing" measures when in public, limited the use of public transit, and barred "gatherings of individuals." In addition, EO 107 directed that "[t]he brick-and-mortar premises of all non-essential retail businesses must close to the public as long as this Order remains in effect." The Order included an utterly subjective list of retail establishments deemed "essential," which included not only such businesses as "Grocery stores," "Pharmacies," and "gas stations," but also "alternative treatment centers that dispense medicinal marijuana," "Pet stores," and "Liquor stores."

Three days later, Defendant Callahan promulgated an Administrative Order further expanding the subjective list of businesses deemed "essential" under EO 107. Administrative Order No. 2020-5, Essential Retail Businesses (Mar. 24, 2020)

(attached as Exhibit 3 to Schmutter Decl.). That revised list includes mobile phone retail and repair shops, bicycle shops, and garden centers. *Id.* at ¶ 1. It does not include firearm or ammunition retailers. *Id.*

The full effect of EO 107 on the ability to acquire firearms in New Jersey can only be understood in the context of background requirements of New Jersey and federal law. Federal law requires all retail firearm purchases to occur through a federally licensed firearm dealer, and the sale generally must be consummated "in person at the licensee's business premises." 18 U.S.C. §§ 922(a)(1)(A), (c). New Jersey law goes even further, requiring virtually *all* firearm transfers to be consummated through a licensed dealer, N.J.S.A. §§ 2C:58-3(a)(2), (b)(2), and further requiring such licensed dealers to sell firearms "only in the building or buildings designated in the[ir] license," *id.* § 2C:58-2(a)(1).[2] Accordingly, almost no one may lawfully "sell, give, transfer, assign or otherwise dispose of, nor receive, purchase, or otherwise acquire" a firearm in New Jersey without visiting a brick-and-mortar licensed firearm dealer to consummate the transfer. *Id.* § 2C:58-3(a)(1), (b)(1).

Moreover, New Jersey law further requires that no firearm transfer may be completed until a licensed retailer has "complete[d] a National Instant Criminal

---

[2] The only exceptions to these requirements are transfers between collectors, between law enforcement officers, "between members of an immediate family," or certain narrow, temporary transfers for less than eight hours. *Id.* § 2C:58-3(a); (b).

5

Background Check." *Id.* § 2C:58-3(a)(3), (b)(3); *see also* 18 U.S.C. § 922(t). And New Jersey regulations provide that this background check must be conducted by "the Division of State Police." N.J.A.C §§ 13:54-3.12, 13:54-3.13(6). While the National Instant Criminal Background Check System ("NICS") is continuing to function during the pandemic, the New Jersey Division of State Police has announced that it is suspending its operation of NICS in New Jersey, in response to EO 107. *See National Instant Criminal Background Check System (NICS),* NJ STATE POLICE NICS ONLINE, https://www.njportal.com/NJSP/NicsVerification (last accessed March 25, 2020) (attached to Schmutter Decl. as Exhibit 4). Given the legal requirement that no firearms transfer may be completed until the State Police have completed a NICS background check, Defendants' suspension of NICS in the State, as a result of EO 107, constitutes an independent ban on the purchase and sale of firearms.

Finally, New Jersey also tightly regulates the purchase and sale of ammunition. State police regulations provide that firearm ammunition may only be sold by a licensed firearm dealer. N.J.A.C. § 13:54-3.2. By shutting down gun dealers, New Jersey therefore also effectively bans the purchase and sale of ammunition.

EO 107's application to firearm retailers and the availability of NICS within New Jersey thus has the necessary effect of banning essentially *all* firearm transfers (and purchases of handgun ammunition) in New Jersey indefinitely.

## II.    EO 107 Prevents Plaintiffs From Purchasing and Selling Firearms.

Defendants' ban on the purchase of firearms and ammunition has eviscerated Plaintiffs' ability to exercise their Second Amendment rights. For example, Plaintiff Jeffrey Kayden does not currently own any firearms, but with COVID-19 spreading throughout the country, he is concerned for the safety of himself and his family and desires to purchase a firearm for self-protection in the home. Declaration of Jeffrey Kayden ¶¶ 6, 10 (Mar. 25, 2020) ("Kayden Decl."). He recently applied for the Permit to Purchase and Firearm Purchaser Identification Card required in New Jersey for the lawful purchase of a handgun or long gun, respectively. *Id.* ¶ 6. His applications for those permits were granted on March 23, and he picked them up from his local police department the following day. *Id.* ¶ 7. But he then learned that because of EO 107, all firearm retailers in the State had been forced to close—and the NICS background-check system had been suspended by the State Police. *Id.* ¶¶ 7–8. Accordingly, as a direct result of EO 107, Plaintiff Kayden has been and remains unable to purchase a firearm or ammunition. *Id.* ¶¶ 7–9. But for EO 107 and Defendants' actions implementing it, plaintiff Kayden would acquire a handgun and shotgun, and the ammunition required to operate them, forthwith. *Id.* ¶ 9.

Defendants' actions have also injured Plaintiff Bob's Little Sports Shop. Plaintiff Bob's Little Sports Shop is a licensed retailer of firearms and firearm ammunition located in Glassboro, New Jersey. Declaration of Robert Viden, Jr. ¶¶ 2–3 (Mar. 25, 2020). Ever since EO 107 took effect, Plaintiff has been forced to stop doing business indefinitely, since it is not deemed an "essential business." *Id.* at ¶ 6. Moreover, even if it *were* allowed to keep its doors open, it would be unable to sell firearms due to the unavailability of the NICS background check system in New Jersey. *Id.* at ¶ 7. Plaintiff Bob's Little Sports Shop has many customers who wish to purchase firearms and ammunition from it forthwith, and it would sell firearms and ammunition to them if it were legally allowed to do so. *Id.* at ¶ 8. If allowed to open, Bob's Little Sports Shop would voluntarily implement sanitary and safety measures, including limiting the number of customers in the store at any one time, strictly observing and enforcing social distancing protocols, providing and requiring customers to wear latex or nitrile gloves when handling any firearms or ammunition, and regularly sanitizing exposed surfaces. *Id.* at ¶ 9.

Finally, EO 107 has had a similar impact on numerous other members of Plaintiff Association of New Jersey Rifle & Pistol Clubs ("ANJRPC"). Plaintiff ANJRPC is a nonprofit membership association organized for the purpose of representing the interests of target shooters, sportsmen, and other law-abiding firearms owners, and defending and advocating their right to keep and bear arms.

8

Declaration of Scott Bach ¶ 2 (Mar. 26, 2020) ("Bach Decl."). Plaintiff ANJRPC has thousands of members in New Jersey, including Plaintiff Kayden, and many of them wish to purchase firearms and ammunition, and would do so forthwith, but are unable to do so because of EO 107 and the closure of the background check portal, although they satisfy all other requirements for owning firearms and ammunition under New Jersey law. *Id.* ¶¶ 3; Kayden Decl. ¶ 5. Likewise, at least one licensed firearm retailer is a member club of ANJRPC and wishes to continue to sell firearms and ammunition, in accordance with applicable New Jersey and federal law, but is being prevented from doing so by EO 107 and the closure of the NICS background check portal. Bach Decl. ¶ 3.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* Here, all four factors favor

preliminarily enjoining Defendants from enforcing EO 107 to indefinitely ban the acquisition of firearms and ammunition.[3]

## III.   Plaintiffs Are Likely To Succeed on the Merits of their Second Amendment Claim.

Establishing likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* at 179. Plaintiffs' Second Amendment challenge is likely to succeed, under this standard, and preliminary injunctive relief should issue.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has held that this constitutional provision "protect[s] an individual right to use arms for self-defense," *Heller*, 554 U.S. at 616, and that because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," it applies to the States via the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

---

[3] "These same factors are used to determine a motion for a temporary restraining order," *Miller v. Skumanick*, 605 F. Supp. 2d 634, 641 (M.D. Pa. 2009), *aff'd sub nom. Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010), and the references to a preliminary injunction throughout this brief encompass both forms of relief.

The Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end scrutiny." *Id.*[4] The first prong is a "threshold inquiry" into whether the challenged conduct is protected by the right to keep and bear arms. *Id.* Here, the answer to that threshold inquiry is plain: if the Second Amendment protects any conduct, it protects the right to purchase an operative firearm for lawful self-defense (and the ammunition needed to operate it). EO 107's flat ban on the exercise of this right is unconstitutional under any standard that could conceivably apply.

## A. The Ban on Firearm Purchases Burdens Conduct Protected by the Second Amendment.

The Second Amendment "protect[s] an individual right to use arms for self-defense," taking "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636. As federal courts have repeatedly recognized, that unassailable "right to possess firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean

---

[4] Plaintiffs reserve their right to argue in subsequent proceedings that a tiers-of-scrutiny approach is never appropriate in Second Amendment cases. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting).

much." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (addressing right to train with firearms). And the right to keep and bear arms would mean little indeed without the corresponding right *to acquire arms in the first place*. Indeed, if the core right to possess a firearm "operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635, "is to have any meaning," *Radich v. Guerrero*, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016), it necessarily "must also include the right to *acquire* a firearm"—making the right of acquisition the "*most fundamental* prerequisite of legal gun ownership," *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014). Accordingly, as the Third Circuit has held, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

Likewise, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). Accordingly, the courts have uniformly held that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* (quotation marks omitted); *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd*, 742 Fed. App'x 218 (9th Cir. 2018) ("Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, the Second Amendment would be toothless." (quotation marks omitted)). As the Third Circuit has explained, "[b]ecause magazines feed

12

ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018).

These conclusions are consistent with the traditional understanding and practices of the People of this Nation, as "[t]he right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms." *Andrews v. State*, 50 Tenn. 165, 178 (1871); *Heller*, 554 U.S. at 583 n.7 ("What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . . ?" (quoting SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796)). There can thus be no doubt that the Second Amendment protects the right to purchase an operative firearm and the ammunition needed to operate it.

That right is especially important in times of national crisis and social upheaval. "The Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing en banc), and in this time of crisis Americans across the Nation are preparing for the worst by acquiring arms for the defense of themselves and their families. The right to self-defense is "the *central component* of the [Second Amendment] right," *Heller*, 554 U.S. at 599, and it is "a basic right, recognized by many legal systems from

ancient times to the present day," *McDonald*, 561 U.S. at 767. Indeed, the right to self-protection and self-preservation was viewed at the Founding as a *natural* right— one that predates government and is necessarily reserved to the people when government is established. *See Heller*, 554 U.S. at 593–94 (citing, e.g., 1 BLACKSTONE'S COMMENTARIES 139, 140 (1765)). The importance of the right to self-defense is shown in sharp relief in times of national emergency, such as the present COVID-19 pandemic, when ordinary social routines, practices, and safeguards begin to break down.

The COVID-19 outbreak, and our society's response, have upended social life as we know it, calling into question basic governmental functions and protections that are ordinarily taken for granted. Across the country, for example, police departments have been forced to "make[] major operational changes in preparation for the continued spread of coronavirus, as they face potential strains in resources and staffing without precedent in modern American history." Alexander Mallin & Luke Barr, *Police implement sweeping policy changes to prepare for coronavirus spread*, ABC NEWS, Mar. 18, 2020, https://abcn.ws/3bl7sij (attached to Schmutter Decl. as Exhibit 5). Those measures include reducing police response to certain types of crimes and announcements that certain criminal laws will simply not be enforced at the present time. *Id.* Several police officers in New Jersey have already been infected by COVID-19—a situation that is likely to only worsen. *See* Anthony

Bellano, *Some NJ Cops Positive For Coronavirus, Others Quarantined*, PATCH, Mar. 21, 2020, https://bit.ly/2xl0ifd (attached to Schmutter Decl. as Exhibit 6); Joe Malinconico, *Paterson police officer and fire captain test positive for coronavirus*, PATERSON PRESS, Mar. 24, 2020, https://njersy.co/2UBONb5 (attached to Schmutter Decl. as Exhibit 7). And at the same time as the resources of police departments have been placed under unprecedented strain, the lockdown of ordinary social life has unsurprisingly led to an increase in public lawlessness such as looting. *See, e.g.*, Yesenia Amaro, *3 arrested on suspicion of looting Fresno County stores amid coronavirus outbreak*, THE FRESNO BEE, Mar. 23, 2020, https://bit.ly/3bmZoNX (attached to Schmutter Decl. as Exhibit 8); David Hernandez, *Man, woman arrested on suspicion of looting in Chula Vista*, SAN DIEGO UNION-TRIBUNE, Mar. 22, 2020, https://bit.ly/3btPb2x (attached to Schmutter Decl. as Exhibit 9).

Indeed, at least sixteen States—including New Jersey, as well as California, New York, Ohio, and Texas—have taken the extraordinary and unprecedented step of *releasing* thousands of inmates into the public, due to the coronavirus outbreak. Lucas Manfredi, *Jails release thousands of inmates to curb coronavirus spread*, FOX BUSINESS, Mar. 22, 2020, https://fxn.ws/2UtPRxG (attached to Schmutter Decl. as Exhibit 10). New Jersey alone has announced that it "will release as many as 1,000 people from its jails in what is believed to be the nation's broadest effort to address the risks of the highly contagious coronavirus spreading among the incarcerated"—

a decision Governor Murphy praised, even as he effectively banned law-abiding New Jersey residents from obtaining firearms to defend themselves from violent criminals. Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, NY TIMES, Mar. 23, 2020, https://nyti.ms/3akEZJd (attached to Schmutter Decl. as Exhibit 11).

The importance of safeguarding "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594, has never been higher than during this extraordinary moment of social upheaval and unprecedented strain on government resources. Indeed, hundreds of thousands of Americans across the Nation have come to the same conclusion: "Gun sales are surging in many U.S. states, especially in those hit hardest by the coronavirus—California, New York and Washington," Kurtis Lee & Anita Chabria, *As the coronavirus pandemic grows, gun sales are surging in many states*, L.A. TIMES, Mar. 16, 2020, https://lat.ms/39kNVNt (attached to Schmutter Decl. as Exhibit 12), with dealers reporting "an unusually high proportion of sales . . . to first-time gun buyers," Richard A. Oppel, Jr., *For Some Buyers With Virus Fears, the Priority Isn't Toilet Paper. It's Guns.*, NY TIMES, Mar. 16, 2020, https://nyti.ms/39gfRCc (attached to Schmutter Decl. as Exhibit 13). Some ammunition retailers have seen an increase of sales of over 1,000%. Chris Cillizza, *How coronavirus has sent gun and ammo sales through the roof*, CNN, Mar. 25, 2020, https://cnn.it/2WID0dM (attached to Schmutter Decl. as Exhibit 14).

And federal background checks have surged by at least 36%, to a level higher than "all but two other months since [the FBI] started performing the queries in the late 1990s. Oppell, *Some Buyers*, NY TIMES, *supra*. As Americans across the country are demonstrating, the basic, fundamental right of armed self-defense—necessarily including the right to acquire firearms and ammunition—has never been more important than it is today. EO 107's restrictions on the purchase of firearms and ammunition thus unquestionably burden conduct protected by the Second Amendment.

**B.      Because it Constitutes a Flat Ban on the Exercise of Second Amendment Rights, EO 107 Is Categorically Unconstitutional.**

The plain text and necessary function of EO 107 is to impose a flat, categorical ban on the exercise of the constitutionally protected right to purchase firearms and ammunition. By its plain language, EO 17 requires "[t]he brick-and-mortar premises of all non-essential retail businesses [to] close to the public as long as this Order remains in effect,"—and the enumerated, subjective list of "essential" businesses does not include firearm retailers (though it does include exceptions for such establishments as "Liquor stores," and "alternative treatment centers that dispense medicinal marijuana"). Moreover, Defendant Callahan's directive preventing the Division of State Police from conducting the required NICS background checks also and independently has the effect of banning all firearm sales in the state, since by

17

law no sale of a firearm may be conducted until the State Police have conducted a NICS background check. *See supra* pp. 5–6.

While the closure of brick-and-mortar retail establishments may not cut off New Jersey citizens' supplies to other necessities, given the availability of e-commerce and delivery services, its effect on firearm sales is to totally foreclose them, given the legal requirements that any firearm purchase must be conducted in person and on the retailer's premises. *See* 18 U.S.C. § 922(c), (t); N.J.S.A. § 2C:58-3(a)(2), (b)(2); *id.* § 2C:58-2(a)(1). As a Pennsylvania judge has explained, "[u]nlike the vast majority of other items, the sale and transfer of firearms sold at retail cannot be completed merely by way of telecommunication and mailing under existing law." *Civil Rights Defense Firm, P.C. v. Wolf*, No. 63 MM 2020 (Pa. Mar. 22, 2020) (Wecht, J., concurring in part and dissenting in part) (attached to Schmutter Decl. as Exhibit 15) (slip op. at 2). EO 107's application to firearm retailers thus, by necessary operation of law, has the effect of completely banning firearm sales within the state as long as the Order is in effect.

The scope of this ban is total. It applies to the purchase of *any type* of firearm—including handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—and it bars their purchase by *any person*—even law-abiding citizens who have obtained the purchase permits or identification cards required by state law. And the ban prevents law-abiding citizens from purchasing firearms even for the

purpose of self-defense in the home—the place "where the need for defense of self, family, and property is most acute." *Id.* at 628. EO 107's application to firearm retailers thus amounts to the following: a flat ban on the purchase of *any* firearm, by *any* person, *anywhere* in the state. It is harder to imagine a more direct, frontal assault on the Second Amendment.

Given that Defendants have completely prohibited law-abiding citizens from acquiring an operative firearm, *Heller* makes the next analytical steps clear. Because the Second Amendment "elevates" the core right to self-defense "above all other interests," infringements upon this "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Id.* at 634–35. Defendants' wholesale prohibition on the right of law-abiding citizens to acquire arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on the right to keep arms at issue there under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id.* at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine

19

it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion). This reasoning applies equally to the ban on the right to keep and bear arms at issue here.

The flat unconstitutionality of New Jersey's ban on purchasing firearms and ammunition under *Heller* is reinforced by subsequent Supreme Court precedent. In *McDonald*, the Supreme Court described *Heller*'s holding as a simple syllogism: having "found that [the Second Amendment] right applies to handguns," the Court therefore "concluded" that "citizens must be permitted to use handguns for the core lawful purpose of self-defense." 561 U.S. at 767–68 (quotation marks and brackets omitted). Then, in *Caetano*, the Court summarily and unanimously reversed a decision of the Massachusetts Supreme Judicial Court that had departed from this approach in upholding a ban on stun guns. The Massachusetts court got the message: "Having received guidance from the Supreme Court in *Caetano II*, we now conclude that stun guns are 'arms' within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). In like manner, New Jersey's attempt to ban its citizens from even acquiring

firearms and ammunition is an option that the Second Amendment simply takes "off the table." *Heller*, 554 U.S. at 636.

While the Third Circuit generally requires restrictions on Second Amendment rights to be scrutinized under "some form of means-end scrutiny," *Marzzarella*, 614 F.3d at 89, such scrutiny is not necessary or appropriate here, where the restriction in question is a flat, categorical ban on the acquisition of *any* firearms or ammunition by *anyone*. That is why other circuits that have adopted a tiers-of-scrutiny analysis as the default form of analysis for most Second Amendment challenges continue to apply *Heller*'s categorical approach to " 'complete prohibition[s]' of Second Amendment rights." *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (quoting Heller, 554 U.S. at 629); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases). EO 107 operates as just such a "compete prohibition," and it thus must be struck down categorically.[5]

---

[5] The invalidity of EO 107 is underscored by the fact that it is plainly preempted by federal law. Under New Jersey law, "firearm" is defined to include even ordinary BB guns, N.J.S.A. § 2C:39-1(f), such that an individual desiring to purchase a BB gun must do so through a licensed firearm retailer, *id.* § 2C:58-3. EO 107 thus constitutes a ban on the purchase and sale of BB guns—in direct contravention of federal law expressly preempting any state from "prohibit[ing] the sale . . . of traditional B-B [guns]." 15 U.S.C. § 5001(g)(ii); *see also Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990).

**C.** **Defendants' Ban on Firearm Purchases Fails Any Level of Heightened Constitutional Scrutiny.**

**1.** **At a Minimum, Strict Scrutiny Should Apply.**

Even if this Court concludes that Defendants' ban on the purchase of firearms and ammunition is not *categorically* unconstitutional, the ban must at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. Applying anything less than strict scrutiny would relegate the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

This conclusion is in accord with precedent. In *Bateman v. Perdue*, the U.S. District Court for the Eastern District of North Carolina analyzed the constitutionality of North Carolina emergency declaration laws that, in part, "forbade the sale or purchase of firearms and ammunition" during a state of emergency. 881 F. Supp. 2d 709, 712 (E.D.N.C. 2012). While the challenged statutes applied only during declared emergencies and were "limited in duration," because they "prohibit[ed] law abiding citizens from purchasing and transporting to their

22

homes firearms and ammunition needed for self-defense," the court concluded that they "str[uck] at the very core of the Second Amendment" and were "at the 'far end of the spectrum of infringement on protected Second Amendment rights.' " *Id.* at 715–16 (quoting *Marzzarella*, 614 F.3d at 97). It accordingly applied strict scrutiny. *Id.* at 716; *see also Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 939, 947–48 (striking down ban on gun sales under heightened scrutiny). This Court should do the same.

### 2. The Ban on Firearm Purchases Fails Even Intermediate Scrutiny.

Ultimately, determining the correct standard of scrutiny is immaterial, however, because Defendants' actions are unconstitutional under any level of heightened scrutiny.[6]

i.    That is so, first, as a matter of law. As Defendant Governor Murphy's comments, yesterday, justifying the ban on firearm sales shows, the decision not to exempt firearm and ammunition retailers from the shut-down order was made with the *specific purpose* of *suppressing Second Amendment rights*. As Defendant Murphy explained, he did not deem firearm retailers to be "essential" because "A

---

[6] Because "rational basis" review is unavailable in the Second Amendment context, *see Heller* 554 U.S. at 628 n.27, Plaintiffs' challenge must at a minimum be decided under intermediate scrutiny.

safer society for my taste has fewer guns and not more guns."[7] Indeed, the motivation behind the shutdown of firearm stores would have been plain for all to see even if Governor Murphy *had not* spelled it out, given the nature of the retailers and activities that *have* been deemed "essential." As noted above and discussed further below, the Order allows unrestricted travel and gathering for educational, political, and religious purposes and confers "essential business" status on such establishments as liquor stores and marijuana dispensaries. And a subsequent administrative order issued by Defendant Callahan provides further exemptions for cell phone stores, garden centers, and bicycle shops. *See supra*, pp. 4–5. The public health impact of these exemptions outstrips any conceivable risk posed by gun stores by many multiples, given that there are over 2,000 liquor stores, thousands of houses of worship, and virtually unlimited opportunities for political gatherings in New Jersey—compared to at most 319 firearm retailers in the State. The only conceivable purpose for drawing these bizarre and irrational distinctions is the one candidly given by Governor Murphy: Defendants, quite apart from the COVID-19 epidemic, believe there should be "fewer guns" in New Jersey.

That purpose, far from substantial or compelling, is flatly illegitimate. Attempting to nakedly suppress the number of guns owned by law-abiding citizens

---

[7] *TRANSCRIPT: March 25, 2020 Coronavirus Briefing*, *supra*, at 9 (attached to Schmutter Decl. as Exhibit 1).

is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Arizona Free Enter.*

*Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011) ("[A] 'beggar thy neighbor' approach to free speech—restricting the speech of some elements of our society in order to enhance the relative voice of others—is wholly foreign to the First Amendment." (brackets and quotation marks omitted)); *cf. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens . . . ."); *Buck Foston's New Brunswick LLC v. Cahill*, 2013 WL 5435289, at *12 (D.N.J. Sept. 27, 2013) (Government cannot retaliate against or seek to deter protected speech).

Courts have applied similar reasoning in the Second Amendment context. For instance, in *Heller v. District of Columbia (Heller III)*, the D.C. Circuit struck down the District of Columbia's prohibition on registering more than one pistol per month. 801 F.3d 264, 280 (D.C. Cir. 2015). The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* But the court rejected that simplistic syllogism, explaining that "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home," and so it simply cannot be right. *Id.*; *see also Grace*, 187 F. Supp. 3d at 148 (reasoning that "it is not a permissible strategy to

26

reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right" (quotation marks omitted)). In other words, the government may not adopt a law with the design and direct effect of limiting the quantity of conduct protected by the Second Amendment.

As Governor Murphy's comments reveal, that is precisely what Defendants have done here. The purpose and effect of their decision to ban the sale of firearms and ammunition in New Jersey is to *limit the number of arms owned by law-abiding citizens*. That brazen hostility to the free exercise of Second Amendment rights is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

ii.     Second, EO 107 also fails any meaningful level of scrutiny because it suffers from an utter lack of tailoring. That is shown by its exemptions. While the firearm retailers necessary to assure the exercise of Plaintiffs' fundamental constitutional rights are not deemed "essential retail businesses," under the Order, Defendants *have* included exemptions for a variety of establishments, including "alternative treatment centers that dispense medicinal marijuana," "Convenience stores," "Liquor stores," "Bicycle shops," "Mobile phone retail . . . shops," and "garden centers." By sheer numbers alone, these establishments pose a threat to public health that is multiples greater than any threat posed by firearm retailers: there

are approximately 2,260 liquor stores in New Jersey,[8] for example, and thousands of houses of Worship statewide, compared to only 319 licensed gun stores, at most.[9] Moreover, as far as plaintiffs are aware, there is no constitutional right to a bottle of hard liquor, six-pack of beer, or the latest iPhone. And medical marijuana facilities operate in open and flagrant violation of federal law. *See* 21 U.S.C. § 812. Yet the retail establishments vending these goods have been deemed "essential," by New Jersey, even while firearm retailers—which enable the right to self-defense protected by the Second Amendment—have not.

Indeed, banning the purchase of firearms and ammunition is far less justifiable than many other products exempted by EO 17, such as home improvement goods or office supplies. In the internet economy, those types of goods are readily available online—without the need to travel to one of the brick and mortar shops exempted by the Order. *See Civil Rights Defense Firm* (Wecht, J., concurring in part and dissenting in part) (slip op. at 2) (noting that "the vast majority of other items" can be purchased "by way of telecommunication and mailing under existing law."). Firearms and ammunition, by contrast, can only be purchased in person in New Jersey. *See supra* pp. 5–6.

---

[8] MARATHON STRATEGIES, LIQUOR STORE DENSITY BY STATE 4 (2014) (attached to Schmutter Decl. as Exhibit 16).

[9] Bureau of Alcohol, Tobacco, Firearms and Explosives, *List of New Jersey Federal Firearms Licensees (FFLs)* (Dec. 2019) (attached to Schmutter Decl. as Exhibit 17).

Other of EO 107's exemptions, while perhaps justifiable on their own terms, show that Defendants have erected a hierarchy of constitutional values—with the Second Amendment relegated to the very bottom rung. The Order specifically allows travel "for any educational, religious, or political reason"—presumably out of concern that banning these activities would raise serious First Amendment concerns. By failing to show similar solicitude to the right to keep and bear arms, New Jersey has in effect imposed an impermissible "hierarchy of constitutional values," *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982)—in direct contravention of the Supreme Court's instruction that the Second Amendment may not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780 (plurality opinion).

Where a challenged law is drastically under-inclusive in this way—failing to regulate activity that, by the Government's own account of the interest justifying the law, ought to be regulated *a fortiori*—that raises serious doubts about whether the challenged restriction is necessary. No one doubts the seriousness of the threat posed by the COVID-19 pandemic, or the importance of "flattening the curve." But if—as New Jersey has concluded—these public-health interests may be served while allowing PetSmart and Total Wine & More to keep their doors open, it simply cannot

be maintained that firearm retailers must be closed in the name of public health and safety.

EO 107's utter lack of tailoring is brought into sharp relief by the coronavirus-related emergency orders that *have* exempted firearm dealers. Illinois, Connecticut, Pennsylvania, Ohio, Louisiana, Arizona, and Wisconsin have all issued shutdown orders akin to EO 107. But unlike New Jersey, those states also acted to safeguard their citizens' constitutional rights, carefully carving out firearm retailers from the scope of the shutdown.[10] Defendants cannot plausibly show that an exception for

---

[10] *See* Executive Order No. 2020-10, Executive order in Response to COVID-19 at ¶ 12(n) (Illinois Mar. 20, 2020) (attached to Schmutter Decl. as Exhibit 18); Executive Order No. 7H, Protection of Public Health and Safety During COVID-19 Pandemic and Response at ¶ 1 (Connecticut Mar. 20, 2020) (attached to Schmutter Decl. as Exhibit 19) (directing Connecticut Department of Economic & Community Development to issue list of essential businesses); Connecticut Department of Economic & Community Devel., Business Exemptions for Coronavirus – Executive Order 7H at ¶ 5 (Mar. 23, 2020) (attached to Schmutter Decl. as Exhibit 20) (designating retail establishments selling "guns and ammunition" as essential businesses); Ohio Department of Health, Director's Stay at Home Order at ¶ 12(q) (Mar. 22, 2020) (attached to Schmutter Decl. at Exhibit 21); Office of the Governor of Louisiana, COVID-19 Statewide Stay at Home Order: Additional Illustrative Examples of Critical Infrastructure Businesses Consistent with Cyber and Infrastructure Security Agency Guidance (Mar. 22, 2020) (attached to Schmutter Decl. as Exhibit 22); Executive Order No. 2020-12, Prohibiting the Closure of Essential Services at ¶ 3(e)(xv) (Ariz. Mar. 23, 2020) (attached to Schmutter Decl. as Exhibit 23); and State of Wisconsin Department of Health and Human Servs., Emergency Order #12: Safer at Home Order at ¶ 13(r) (Mar. 24, 2020) (attached to Schmutter Decl. as Exhibit 24). Pennsylvania initially failed to exempt firearm and ammunition retailers from its shutdown order, but it subsequently clarified that they are exempt, so long as they follow special sanitizing and social distancing measures. *See infra*, at p. 34.

firearm stores is consistent with public health necessities in these jurisdictions but not in New Jersey.

iii.    EO 107's application to firearm retailers is also unconstitutional under any meaningful form of scrutiny because of the ready availability of less constitutionally restrictive means of pursuing the same ends.

Even under intermediate scrutiny, a challenged restriction cannot burden substantially more constitutionally protected conduct than necessary to achieve the State's interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). In *McCullen*, for example, the U.S. Supreme Court struck down a Massachusetts "buffer zone" law forbidding certain types of speech outside of abortion clinics, reasoning that the State had failed to show that measures substantially less restrictive than such an extreme prophylactic measure were not just as "capable of serving its interests." *Id.* at 494. Massachusetts' law, the Court noted, was "truly exceptional," and the State was able to "identify no other State with a law" that was comparable, raising the "concern that the Commonwealth has too readily forgone options that could serve its interests just as well." *Id.* at 490. And even in the context of intermediate scrutiny, the Court concluded, the State must "show[ ] that it seriously undertook to address the problem with less intrusive tools readily available to it," or at the least, "that it considered different methods that other jurisdictions have found effective." *Id.* at 494. This requirement, the Court explained, "prevents the government from too

readily sacrificing speech for efficiency." *Id* at 490. (brackets and quotation marks omitted).

Defendants' ban on firearm sales flunks intermediate scrutiny under the very same reasoning. While New Jersey concluded that less intrusive measures were sufficient to safeguard public health in the context of pet stores, cell phone shops, and liquor stores, there is no evidence that it considered similarly exempting firearm retailers—even though seven other States have included such an exception. And even apart from a simple exemption, as in *McCullen*, there are other, far less-restrictive means available for achieving the State's professed goals. New Jersey could have, for example, (1) limited the number of people allowed in a firearm store at any one time to maintain social distancing; and (2) mandated enhanced sanitizing procedures for firearm retailers that remained open. There is no evidence that Defendants *even considered* these alternatives—which is alone fatal, under intermediate scrutiny. *See id.* at 494; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016). Employing these methods may be less simple than a flat ban. But while nakedly suppressing constitutionally protected conduct "is sometimes the path of least resistance," intermediate scrutiny's tailoring requirement is designed precisely to "prevent[ ] the government from too readily sacrificing [constitutional rights] for efficiency." *McCullen*, 573 U.S. at 486 (brackets and quotation marks omitted).

Given the timing of the State Police's closure of the NICS portal, that closure appears to have been a consequence of EO 107's shut-down of all firearm retailers in the State. To the extent the State has independent safety concerns about the operation of the NICS platform in New Jersey, a ready, less-constitutionally-burdensome alternative exists: suspend the regulatory requirement that the background check be conducted by the State Police, and allow federal authorities to conduct the NICS check directly, as is already done in 33 states. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Permanent Brady State Lists*, https://bit.ly/33SfX1N (attached to Schmutter Decl. as Exhibit 25).

A similar lack of tailoring formed the basis of the *Bateman* court's invalidation of North Carolina's emergency laws. As the court explained,

> The problem here is that the emergency declaration statutes, are not narrowly tailored to serve the government's interest in public safety. They do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times. Rather, the statutes here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest.

881 F. Supp. 2d at 716. Similarly, Justice Wecht's separate opinion in *Civil Rights Defense Firm* likewise homed in on the inadequate tailoring of the Pennsylvania emergency order at issue there:

> [J]ust as the Governor has permitted restaurants to offer take-out
> service but restricted dine-in options, the Governor may limit the
> patronage of firearm retailers to the completion of the portions of a
> transfer that must be conducted in-person. Such an accommodation
> may be effectuated while preserving sensible restrictions designed to
> slow the spread of COVID-19, but nonetheless provide a legal avenue
> for the purchase and sale of firearms, thus avoiding an impermissible
> intrusion upon a fundamental constitutional right.

*Civil Rights Defense Firm* (Wecht, J., concurring in part and dissenting in part) (slip

op. at 3–4). While the majority did not adopt Justice Wecht's approach, his reasoning

was so compelling that the Governor of Pennsylvania recently responded by

exempting firearm dealers from the scope of his earlier shutdown order, authorizing

them to "operate physical businesses on a limited basis to complete only the portions

of a sale/transfer that must be conducted in-person under the law, subject to the

following restrictions: 1) all such sale/transfers will be conducted by individual

appointment during limited hours only so as to minimize social interactions and

congregating of persons; 2) the dealer will comply with social distancing,

sanitization of applicable area between appointments, and other mitigation measures

to protect its employees and the public."[11] Other jurisdictions that initially failed to

exempt firearm retailers have also reconsidered that course of action.[12]

---

[11] Governor Tom Wolf, Industry Operation Guidance (Mar. 24, 2020), https://bit.ly/3bnifZl (attached to Schmutter Decl. as Exhibit 26).

[12] Stefanie Dazio & Don Thompson, *LA sheriff clashes with county lawyer over closing gun shops*, FOX 26 NEWS, Mar. 24, 2020, https://bit.ly/3dwjMxZ (attached to Schmutter Decl. as Exhibit 27).

The Second Amendment requires no less in New Jersey. It is not enough to show that the COVID-19 outbreak represents an urgent public health crisis. Rather, to sustain EO 107's application to firearm retailers, the Government must show that its ban on firearm sales is necessary to protect public health: (1) even though it has allowed other retail establishments, such as liquor stores, marijuana dispensaries, and garden centers to remain open, and (2) even though a variety of measures are available to protect the public health *while allowing* law-abiding New Jersey citizens to continue to exercise their Second Amendment rights.

The bottom line is this. If gun stores adopt reasonable, tailored social-distancing measures and enhanced sanitation—as Plaintiff Bob's Little Sports Shop has pledged to do—Defendants simply cannot show that their outright *ban* on firearm sales is necessary to advance public safety. Plaintiffs are therefore likely to succeed on the merits of their Second Amendment challenge.

## IV.   Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

The conclusion that Plaintiffs have a reasonable probability of success on their Second Amendment claim compels the conclusion that they face irreparable injury in the absence of injunctive relief. It is well-accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g.*, *id.*

(First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth

Amendment). Rights under the Second Amendment should be treated no differently.

*McDonald*, 561 U.S. at 780.

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights. . . . The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quotation marks and

citation omitted). Each day Defendants' unconstitutional ban on purchasing firearms

and ammunition continues in force, Mr. Kayden and others like him risk physical

injury because they are unable to exercise their Second Amendment right to self-

defense. Obviously, that injury cannot be compensated through money damages. *See

id.*

## V.    The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief.

The public interest and balance of equities likewise favor Plaintiffs given that

Plaintiffs are likely to succeed on the merits of their constitutional claims. "[I]t is

always in the public interest to prevent the violation of a party's constitutional

rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the

enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel.

Ayers*, 710 F.3d at 114; *see also Wrenn*, 864 F.3d at 667. On the other side of the

scale, Defendants suffer little harm, as they have no valid interest in enforcing New Jersey's unconstitutional ban and, as explained above, there is no substantial reason demonstrating it is needed to safeguard public health.

## VI.     The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," the Third Circuit has recognized that the district court may sometimes dispense with that requirement. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In "noncommercial cases" such as this one the Court should "balance [ ] the equities of the potential hardships that each party would suffer as a result of a preliminary injunction" and may excuse the bond on that basis. *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996). "The court should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right." *Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. 1998). Here, Defendants will not suffer costs and damages from the proposed preliminary injunction, while imposing a more than *de minimis* bond would unduly interfere with Plaintiffs' Second Amendment Rights. Plaintiffs should therefore not be required to post security, or should be required to post only a nominal amount.

## VII. The Court Should Enter Final Judgment Awarding a Permanent Injunction.

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction restraining the enforcement of EO 107; and because the claims in this case require no further factual development, permanent injunctive relief is likewise appropriate. FED. R. CIV. P. 65(a)(2) authorizes a court considering a motion for preliminary injunctive relief to "advance the trial on the merits and consolidate it with the hearing" on the motion for preliminary relief in appropriate cases. *See also DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 152 n.6 (3d Cir. 1984) ("[A] preliminary injunction hearing may be combined with a hearing on the merits, pursuant to FED. R. CIV. P. 65(a)(2), if it is accompanied by notice to the parties sufficient to enable them to present all of their evidence."); *Getzes v. Mackereth*, 2013 WL 5882040, at *2 (M.D. Pa. Oct. 30, 2013) (consolidating the merits with the preliminary injunction proceeding where the preliminary relief sought by the plaintiff "is the same which he hopes to ultimately obtain following a trial on the merits"). Courts have repeatedly held that such consolidation is appropriate where "no factual or legal disputes will remain once the Court resolves the preliminary injunction motion," *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014), such that "the eventual outcome on the merits is plain at the preliminary injunction stage," *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994); *accord Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir.

38

1998), *abrogated on other grounds Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004); *Kickapoo Traditional Tribe of Texas v. Chacon,* 46 F. Supp. 2d 644, 648–49 (W.D. Tex. 1999).

That is the case here. The facts relevant to Plaintiffs' challenge—that Defendants have promulgated and are enforcing EO 107, that it contains exemptions for some establishments but not firearm retailers, and that it thus flatly bars ordinary, law-abiding citizens such as Plaintiffs from purchasing firearms and ammunition—are not plausibly in dispute. Rather, whether Plaintiffs' challenge will prevail turns entirely on this Court's resolution of the questions of law presented above—questions that, as we have explained, the Court is bound to resolve in Plaintiffs' favor as a matter of law. Accordingly, "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts," and the Court should enter final judgment and permanent, not merely preliminary, injunctive relief. *Wrenn*, 864 F.3d at 667; *see also Moore*, 702 F.3d at 942.

## CONCLUSION

For the foregoing reasons, the Court should restrain and enjoin the enforcement of EO 107 against firearm retailers and Defendants' closure of the NICS background-check portal in New Jersey.

Dated: March 26, 2020                          Respectfully submitted,

David H. Thompson*                             s/Daniel L. Schmutter
Peter A. Patterson*                            Daniel L. Schmutter
COOPER & KIRK, PLLC                            HARTMAN & WINNICKI, P.C.
1523 New Hampshire Avenue, N.W.                74 Passaic Street
Washington, D.C. 20036                         Ridgewood, New Jersey 07450
(202) 220-9600                                 (201) 967-8040
(202) 220-9601 (fax)                           (201) 967-0590 (fax)
dthompson@cooperkirk.com                       dschmutter@hartmanwinnicki.com

*Pro hac vice application forthcoming

Attorneys for Plaintiffs